591 A.2d 913

HOWARD S. TWISS, PLAINTIFF–RESPONDENT, v. STATE OF NEW JERSEY, DEPARTMENT OF THE TREASURY, OFFICE OF FINANCIAL MANAGEMENT, DEFENDANT–APPELLANT.

Argued February 26, 1991—Decided June 24, 1991.

*William Harla,* Assistant Attorney General, argued the cause for appellant (*Robert J. Del Tufo,* Attorney General of New Jersey, attorney; *Michael R. Clancy,* Assistant Attorney General, of counsel; *Robert P. Krenkowitz,* Deputy Attorney General, on the brief).

*A. John Falciani* argued the cause for respondent (*Falciani & Fletcher,* attorneys; *Louis Adler,* on the brief).

The opinion of the Court was delivered by

POLLOCK, J.

The issue is whether defendant, New Jersey Department of the Treasury (the Treasury), must disclose to plaintiff, Howard S. Twiss, who is engaged in the business of locating the owners of unclaimed bank accounts, not only the names and addresses of the owners, but also the amount of money in the accounts. On cross-motions for summary judgment, the Law Division granted the Treasury's motion to dismiss the complaint. The Appellate Division reversed. 239 *N.J.Super.* 342, 571 *A.*2d 333

(1990). We granted the State's petition for certification, 122 *N.J.* 395, 585 *A.*2d 395 (1990), and now reverse the judgment of the Appellate Division and reinstate that of the Law Division. We hold that under the Uniform Unclaimed Property Act, *N.J.S.A.* 46:30B–1 to –109 (UUPA), the Treasury is not obliged to disclose the amount in an unclaimed bank account to a third party, such as Twiss, who has no beneficial interest in the account. We hold further that the Legislature intended to give retroactive effect to the UUPA, so that it governs the Treasury's obligation to disclose information concerning all such accounts, no matter when created.

–I–

Each year the Treasury takes custody of some thirty million dollars in unclaimed bank accounts, about five million dollars of which it pays to the account owners, leaving a net for the State of some twenty-five million dollars. The affected accounts number several hundred thousand per year.

Twiss pursues his business in several states in addition to New Jersey. He seeks from the Treasury not only the name and address of the account owner, but also the amount in the account. Armed with this information, he then tries to find the owner. Once he locates the owner, Twiss offers to tell the owner about the account in consideration of a fee that varies from ten to thirty percent, plus expenses. Twiss can locate the owner without knowing the amount in the account. Because of the contingent nature of the fee, his incentive in finding the owner increases with the amount.

As the Appellate Division noted, the financial benefit to the State from the escheat of unclaimed accounts injects ambivalence into the State's interest in the discovery of the owners. See 239 *N.J.Super.* at 354, 571 *A.*2d 333. When considering the competing interests of the State, the account owner, and a third party such as Twiss, our role is not to strike our own balance,

but to ascertain the balance that has been struck by the Legislature.

After the Law Division rendered its decision, the Legislature enacted the UUPA. In that statute, which took effect on April 14, 1989, the Legislature declared that only the name and address of the account owner, but not the amount of the account, should be disclosed to someone with no beneficial interest in the account. *N.J.S.A.* 46:30B–76. Because the UUPA had not been enacted when the Law Division rendered its decision, that court based its decision on the then-existing statutory and regulatory scheme.

At the time of the Law Division decision, *N.J.S.A.* 17:9–22 and –25(a) governed the disclosure of information pertaining to unclaimed bank deposits. Those statutes, since repealed by the UUPA, *N.J.S.A.* 46:30B–109, required public disclosure of the name, address, and the amount due on unclaimed bank deposits. A 1963 Treasury regulation, however, permitted only persons with a "legitimate beneficial interest" to examine records of escheated accounts. The Treasury enacted the regulation under the authority granted to it by Executive Order Number 9, promulgated by then-Governor Richard J. Hughes pursuant to the Right to Know Law, which permitted the Governor to except certain records from disclosure under that law. *See N.J.S.A.* 47:1A–2. The executive order authorized agency heads to exclude certain records from public scrutiny.

Relying on the Treasury regulation, the Law Division held that because Twiss had no legitimate beneficial interest in the welfare of the owners of the accounts or in the protection of their property rights, he was not entitled to inspect the records of the escheated accounts. The Appellate Division reversed, ruling that the regulation was inconsistent with *N.J.S.A.* 17:9–22 and –25(a), the Right to Know Law, and Executive Order Number 9. 239 *N.J.Super.* at 352, 571 *A.2d* 333. The court concluded that both *N.J.S.A.* 17:9–22 and –25(a) and the Right to Know Law compelled public disclosure of the name and

address of the owners and the amounts due in the unclaimed bank accounts. *Id.* at 355–56, 571 *A.*2d 333. It also found that the UUPA does not apply retroactively and, therefore, does not govern this case. *Id.* at 356–57, 571 *A.*2d 333. Anticipating that similar issues would arise under the UUPA, however, the court noted that the statute, like *N.J.S.A.* 17:9–22, requires disclosure of the names and addresses of the owners and the amount in the abandoned accounts. *Id.* at 360, 571 *A.*2d 333. We disagree with the Appellate Division in its interpretation of both the meaning and effect of the UUPA. We hold that the UUPA does not require disclosure of the amount in the accounts and that it applies retroactively. Because of that holding, we need not resolve the issue that divided the lower courts, whether the prior law, *N.J.S.A.* 17:9–22, compelled the disclosure of that information.

–II–

Before addressing the merits of Twiss's claims, we first consider the threshold question whether the UUPA or the prior law governs that claim. "When considering whether a statute should be applied prospectively or retroactively, our quest is to ascertain the intention of the Legislature." *State, Dep't of Envtl. Protection v. Ventron Corp.*, 94 *N.J.* 473, 498, 468 *A.*2d 150 (1983).

Generally, courts favor prospective application of statutes. *Gibbons v. Gibbons*, 86 *N.J.* 515, 521, 432 *A.*2d 80 (1981). Fundamental fairness suggests that government give prior notice of a statute so citizens may conform their behavior before its enforcement. *Id.* at 522, 432 *A.*2d 80; N. Singer, *Sutherland on Statutes and Statutory Construction* § 41.02 at 341 (4th ed. 1986) (*Sutherland*). Retroactive application also tends to "disturb feelings of security in past transactions." *Sutherland, supra,* § 41.04 at 348. Moreover, retroactive application of a statute may implicate due process rights. *Ventron, supra,* 94 *N.J.* at 498–99, 468 *A.*2d 150.

The rule favoring prospective application, however, is one only of statutory interpretation. Its purpose is to aid the court in the search for legislative intent. *Rothman v. Rothman*, 65 *N.J.* 219, 224, 320 *A.*2d 496 (1974). Courts should not apply the rule mechanistically. Rather, "[w]here * * * supervening considerations clearly compel a contrary determination, this, like all other rules of statutory construction[,] must give way." *Ibid.* When the Legislature does not clearly express its intent to give a statute prospective application, a court must determine whether to apply the statute retroactively.

Two questions inhere in the determination whether a court should apply a statute retroactively. The first question is whether the Legislature intended to give the statute retroactive application. *Gibbons, supra*, 86 *N.J.* at 522, 432 *A.*2d 80. If so, the second question is whether retroactive application is an unconstitutional interference with "vested rights" or will result in a "manifest injustice." *Ventron, supra*, 94 *N.J.* at 498–99, 468 *A.*2d 150; *Gibbons, supra*, 86 *N.J.* at 523, 432 *A.*2d 80. Once a court determines that a statute applies retroactively, it should apply the statute in effect at the time of its decision. *Kruvant v. Mayor & Council of Cedar Grove*, 82 *N.J.* 435, 440, 414 *A.*2d 9 (1980).

Courts will apply statutes retroactively when the Legislature has expressed its intent, either explicitly or implicitly, that the statute should be so applied; when the statute is curative; or when the reasonable expectations of those affected by the statute warrant such application. *Gibbons, supra*, 86 *N.J.* at 522–23, 432 *A.*2d 80. Courts have found that the Legislature implicitly intended retroactive application when such an application was "necessary to make the statute workable or to give it the most sensible interpretation." *Id.* at 522, 432 *A.*2d 80; *see Rothman, supra*, 65 *N.J.* at 223–24, 320 *A.*2d 496 (court applied equitable distribution statute retroactively because prospective application would confront courts with

"difficult if not impossible" task and would mean "full effect of the statute would not be felt for at least a generation").

In the UUPA, the Legislature did not expressly state its intent that the entire statute should apply prospectively. Indeed, two indicia of such an intent, a postponed effective date and a failure to repeal prior law, see *Sutherland, supra,* § 41.04 at 350, are absent from the UUPA. The statute became effective immediately, *L.* 1989 *c.* 58, § 6 at 230, and explicitly repealed the statutory provisions it replaced, *N.J.S.A.* 46:30B–109. Moreover, the language and spirit of the UUPA indicate that the Legislature intended to give it a retroactive application.

Contrary to the ruling of the Appellate Division, see 239 *N.J.Super.* at 357, 571 *A.*2d 333, a close examination of the language of the UUPA reveals that the Legislature intended to include within the UUPA's requirements property "compiled * * * filed * * * [and] turned over to the State under the provisions of * * * Title [17]," *ibid.* Like the predecessor statute, *N.J.S.A.* 17:9–22, the UUPA requires financial institutions to file reports with the Treasurer containing information about the unclaimed property, including the name and address of the depositor and the amount in each account. *N.J.S.A.* 46:30B–46. Under the UUPA, the initial report must include "all items of property that would have been presumed abandoned during the 10–year period preceding the effective date of this chapter *as if this chapter had been in effect during that period.*" *N.J.S.A.* 46:30B–5 (emphasis added). That provision manifests the legislative intent that the UUPA affect the reporting of property abandoned decades before the effective date of the act.

In addition, the UUPA penalties for non-compliance are harsher than the penalties under the prior law. *Compare N.J.S.A.* 46:30B–104, –105 (willful failure to report results in $100–per–day fine) *with N.J.S.A.* 17:9–22 (willful failure to report resulted in $25–per–day fine). Without reference to the

other provisions of UUPA, the Legislature amended *N.J.S.A.* 46:30B–4 to clarify its intention that the UUPA penalties for non-compliance should apply prospectively. *Statement to Assembly Amendments of S. 888* at 22 (*Assembly Statement*). That the Legislature singled out the penalty provisions of *N.J.S.A.* 46:30B–4 to apply prospectively suggests that it anticipated retroactive application of the other sections of the act.

The purpose of the UUPA, to unify the law of unclaimed property and to conform New Jersey law to the law of other jurisdictions, *N.J.S.A.* 46:30B–2, also favors retroactive application. Like the statute in *Gibbons*, the UUPA is curative, reflecting the Legislature's attempt to improve the existing statutory scheme. 86 *N.J.* at 524, 432 *A.*2d 80. In this sense, retroactive application of the statute is necessary to achieve its remedial purposes. *Sutherland, supra,* § 41.11 at 410–11; *see also Kruvant, supra,* 82 *N.J.* at 440, 414 *A.*2d 9 (courts will give statutes retroactive application to effectuate current policy declared by legislative body). Illustrative of the UUPA's unifying goal is *N.J.S.A.* 46:30B–74, which provides on the effective date of the act for immediate transfer to the UUPA trust fund of all assets in the trust funds established by prior unclaimed-property statutes. Any claims for restitution of the unclaimed property transferred to the preexisting funds are to be satisfied from the assets of the UUPA trust fund. *N.J.S.A.* 46:30B–74. Thus, the UUPA affords uniform treatment to unclaimed bank deposits, no matter when or under what law the banks reported the existence of these funds to the Treasury.

Finally, retroactive application of the UUPA neither interferes unconstitutionally with vested rights nor results in any manifest injustice. Retroactive legislation that impairs or destroys a "vested right" may violate the due process clauses of the federal, *U.S. Constitution* amendment XIV, section 1, or state, *N.J. Constitution* article 1, paragraph 1, constitutions. *See Panzino v. Continental Can Co.,* 71 *N.J.* 298, 304, 364 *A.*2d 1043 (1976). Retroactive civil legislation, however, generally does not violate due process unless it results in "particular-

ly harsh and oppressive" consequences. *Ventron, supra,* 94 *N.J.* at 499, 468 *A.*2d 150. Applying the UUPA retroactively neither divests property owners of vested rights nor disadvantages preexisting relationships. See *Sutherland, supra,* § 41.04 at 349 (rule favoring prospectivity applied so that statutes do not interfere with contract obligations or vested rights). Unlike under the prior unclaimed property laws, *see, e.g., N.J.S.A.* 17:9–20, under the UUPA unclaimed property does not escheat to the State, but remains vested in the owner. *Senate Judiciary Committee Statement to S. 2093* at 1 (June 16, 1988), *reprinted in N.J.S.A.* 46:30B–1, at 484–85.

█ Furthermore, Twiss has no vested right that is impaired by retroactive application. An elusive concept, undefined in both the federal and state constitutions, "vested right" encompasses a fixed interest entitled to protection from state action. *Pennsylvania Greyhound Lines v. Rosenthal,* 14 *N.J.* 372, 384–85, 102 *A.*2d 587 (1954). Twiss offered no evidence that as an "heir hunter" his access to the Treasury records is such a right.

Finally, we perceive no unfairness in applying the UUPA retroactively to Twiss's claims. Nothing indicates that Twiss relied to his detriment on the prior law. Indeed, under the 1963 Treasury regulation, Twiss would not have received even the names and addresses of the account owners. Thus, retroactive application of the UUPA does not deprive Twiss of any right that he possessed prior to its enactment. In sum, we conclude that the UUPA, the law in effect at the time of our decision, governs the case. *See Kruvant, supra,* 82 *N.J.* at 440, 414 *A.*2d 9.

-III-

We now turn to the merit of Twiss's claims under the UUPA and the Right to Know Law. We begin with the relevant provisions of the UUPA. Under that statute, the Treasurer is obliged to record information about bank deposits:

> Before making any deposit of funds [to the UUPA Trust Fund], the [Treasurer] shall record the *name and last known address* of each person appearing from the holder's reports to be entitled to the property and the name and last known address of each insured person or annuitant and beneficiary *and with respect to each policy or contract listed in the report of any insurance company, its number, the name of the company, and the amount due.* However, the [Treasurer] shall not include in this record any information deemed confidential under [*N.J.S.A.*] 46:30B–76.1. The record shall be available for the public inspection at all reasonable business hours. [*N.J.S.A.* 46:30B–76 (emphasis added).]

The Appellate Division interpreted this provision to require the Treasurer to record the name, last known address, and amount due of not only funds due under insurance policies or contracts, but also unclaimed bank deposits. 239 *N.J.Super.* at 360, 571 *A.*2d 333. The plain words of the statute belie that reading.

As a common, if specialized, form of written expression, statutes should be accorded their ordinary or plain meaning. *Kimmelman v. Henkels & McCoy, Inc.*, 108 *N.J.* 123, 128, 527 *A.*2d 1368 (1987); *Mortimer v. Board of Review*, 99 *N.J.* 393, 398, 493 *A.*2d 1 (1985). The plain meaning of *N.J.S.A.* 46:30B–76 is to require the Treasurer "with respect to each policy or contract listed in the report of an insurance company" to record the amount due of the funds derived from those policies or contracts. Concerning all other funds, the Treasurer need record only the name and last known address of each person apparently entitled to the property. *N.J.S.A.* 46:30B–76. Thus, with the exception of insurance policies or contracts, *N.J.S.A.* 46:30B–76 provides for public inspection of only the names and addresses of owners of unclaimed property.

*N.J.S.A.* 46:30B–46 and –47, however, require holders of unclaimed property to submit a written report to the Treasurer that includes the amount due on unclaimed deposits. A "holder" is any "person in possession of property belonging to another," *N.J.S.A.* 46:30B–6, including a bank. *N.J.S.A.* 46:30B–6(g)(1), –6(d), –6(c). The Right to Know Law states that, except as otherwise provided by state or federal law, all records "required by law to be made, maintained or kept on file" by any government entity are "public records" to which

every citizen has access. *N.J.S.A.* 47:1A–2. For the purposes of this opinion, we assume, as have the parties, that *N.J.S.A.* 46:30B–46 and –47 trigger disclosure under the Right to Know Law of information required to be kept as a public record. The UUPA specifically excepts from the requirements of the Right to Know Law, however, information that is "confidential" under any federal or New Jersey law when in possession of a bank. *N.J.S.A.* 46:30B–76.1. By adding the confidentiality provisions, *N.J.S.A.* 46:30B–76.1, –76.2, and –76.3, the Legislature departed from the 1981 Uniform Unclaimed Property Act on which the UUPA is otherwise based. The reason for the departure is to ensure that information confidential when possessed by a bank does not lose its confidential nature when the bank delivers it to the Treasurer. *See N.J.S.A.* 46:30B–76.1, –76.2; *Assembly Statement, supra,* at 23.

█ In that regard, *N.J.S.A.* 46:30B–76.1 provides:

Any record or information that is deemed confidential under any New Jersey or federal law when in possession of [a bank] shall continue to be confidential when revealed or delivered to the [Treasurer] and shall not be considered a public record under [*N.J.S.A.* 47:1A–2].

Only apparent owners and certain government officials from other jurisdictions may inspect confidential records. *N.J.S.A.* 46:30B–76.2. Thus, if bank records are confidential when in the possession of a bank, they remain confidential when transferred to the Treasurer.

█ That conclusion leads to the further inquiry whether the amount of funds contained in a bank account is confidential when in the possession of the bank. Based on its conclusion that both the UUPA, *N.J.S.A.* 46:30B–76, and the prior law, *N.J.S.A.* 17:9–22, require disclosure of unclaimed deposits, the Appellate Division found that such information is not confidential. 239 *N.J.Super.* at 359, 571 *A.*2d 333. The court also reasoned that by abandoning the account, depositors waive any confidentiality in their relationship with the bank. *Id.* at 360, 571 *A.*2d 333. We disagree. A more logical rationale is that the Legislature added the confidentiality provisions to the

UUPA to conform the statute to the preexisting practice of the Treasurer, which was to deny public access to the amount due on abandoned accounts.

Supporting that explanation is the legislative history of certain amendments to the UUPA, which indicate that the Legislature intended the amendments to "conform the bill to many of the current practices of the State Treasurer." *Assembly Statement, supra,* at 23. Before the enactment of the UUPA, the undisputed practice of the Treasurer was not to disclose the amount due in abandoned accounts to heir hunters or other third parties with no interest in the unclaimed deposits. That practice, as the affidavit of Edward J. Mooney, supervisor of escheats with the Treasury, states, is in reaction to deceptive and fraudulent practices of heir hunters in pursuing their business. From this we conclude that the Legislature, when enacting the UUPA, contemplated that such information would be available only to the apparent owners of the accounts.

For the purposes of this opinion, it is neither necessary nor prudent to analyze in detail the extent to which confidentiality circumscribes bank records. Nor do we reach the arguments advanced by the State that bank records are vested with a constitutional right of privacy. We merely note that in adopting the UUPA the Legislature considered the amount in bank accounts to be confidential.

Moreover, both federal and New Jersey law recognize a bank's obligation to keep confidential the financial information of its customers. The Right to Financial Privacy Act (RFPA), 12 *U.S.C.A.* § 3401 to 3422, strictly limits government access to information contained in financial records. Because it covers only government access to financial information, RFPA does not strictly apply to this case. RFPA's language and legislative history, however, demonstrate that bank records are confidential and that banks may not ordinarily disclose them. Congress enacted RFPA following the decision of the United States Supreme Court in *United States v. Miller,* 425 *U.S.* 435, 440, 96

*S.Ct.* 1619, 1622, 48 *L.Ed.*2d 71, 77–78 (1976), which held that bank customers have no reasonable expectation of privacy in bank records. *Young v. United States Dep't of Justice,* 882 *F.*2d 633, 636 (2d Cir.1989); *H.R.Rep.* No. 1383, 95th Cong., 2d Sess. 34 (1978) (*H.R.Rep.*), *reprinted in* 1978 *U.S.Code Cong. & Admin.News* 9273, 9306. Perceiving the need to regulate the government's access to financial information, Congress enacted RFPA to "protect the customers of financial institutions from unwarranted intrusion into their records." *H.R.Rep., supra,* at 33, *reprinted in* 1978 *U.S.Code Cong. & Admin.News* at 9305.

Reflecting that congressional concern, RFPA prohibits government access to financial records of any customer of a financial institution unless the customer consents to such disclosure, the government obtains a subpoena or a search warrant, or the government makes a formal written request. 12 *U.S. C.A.* § 3402. In strictly circumscribing government access to financial information, Congress acknowledged "the sensitive nature of [financial] records" and recognized the "customers' right of privacy" in such information. *H.R.Rep., supra,* at 33–34, *reprinted in* 1978 *U.S.Code Cong. & Admin.News* at 9305–06.

New Jersey similarly recognizes a right to confidentiality in bank records. Indeed, the former Chancery Court was the first American court to address the issue of the confidentiality of bank records. *Privacy of Financial Records,* 1986 *Ann.Surv. Am.L.* 587, 594. See *Brex v. Smith,* 104 *N.J.Eq.* 386, 146 *A.* 34 (Ch.1929). In *Brex,* the court, finding that banks have an implied obligation to keep bank records secret, enjoined a prosecutor who had not obtained a subpoena from examining all bank accounts of all members of the Newark police department. 104 *N.J.Eq.* at 390–91, 146 *A.* 34. The court reasoned that citizens had a right of personal security in their *"private affairs, books and papers "* that prohibits government entities from directing "fishing expeditions" into these records without proper authority. *Ibid.* (citing *In re Pacific Ry. Comm'n,* 32 *F.*

241, 250 (1887), and *Federal Trade Comm'n v. American Tobacco Co.*, 264 *U.S.* 298, 44 *S.Ct.* 336, 68 *L.Ed.* 696 (1924)). New Jersey courts have reaffirmed the reasoning in *Brex* that "a generally recognized obligation of confidentiality" exists between a bank and its customers. *Roth v. First Nat'l State Bank,* 169 *N.J.Super.* 280, 284–85, 404 *A.*2d 1182 (App.Div.), *cert. denied,* 81 *N.J.* 338, 407 *A.*2d 1212 (1979); *see also In re Addonizio,* 53 *N.J.* 107, 133–34, 248 *A.*2d 531 (1968) (bank may have contractual obligation to keep customers' transactions confidential, but must comply with subpoena).

The Appellate Division recognized that an implied duty of confidentiality may exist, but concluded that courts may presume that the depositor consents to disclosure of information about unclaimed property. 239 *N.J.Super.* at 360, 571 *A.*2d 333. The dissent agrees with this reasoning, theorizing that it is "both pragmatic and fair" to find that depositors impliedly consent to disclosure. *Post* at 478, 591 *A.*2d at 921. Whatever appeal inheres in that theory, it directly contradicts the plain language of *N.J.S.A.* 46:30B–76.1, which ensures that a customer's right of confidentiality survives the customer's presumed abandonment of the property. Indeed, the Legislature added the confidentiality provisions to the UUPA to provide specifically that neither the presumption of abandonment nor the transfer of the funds to the Treasurer would affect the confidential nature of the information. We need not define the outer limits of a depositor's implied right of confidentiality in his or her bank records. For our purposes, it suffices to note that depositors reasonably can expect that banks will not broadcast the amount on deposit in their accounts. That right is sufficient to trigger the requirements of *N.J.S.A.* 46:30B–76.1. It follows that the amount of money in a bank account, which is deemed confidential before being reported to the Treasurer, remains confidential after reporting.

The judgment of the Appellate Division is reversed, and the judgment of the Law Division is reinstated.

STEIN, J., dissenting.

I agree with the majority's determination that the Uniform Unclaimed Property Act (UUPA or Act) should be applied retroactively. *Ante* at 470, 591 *A*.2d at 917. I part company with the Court when it interprets the Act to require that the amount of money in an abandoned bank account be treated as confidential and hence not ascertainable by one in the business of tracking down the rightful owner. *Ante* at 475, 591 *A*.2d at 920. At oral argument, Twiss informed the Court that access to the amount due in unclaimed bank deposits is critical to the success of his enterprise, explaining that an abandoned bank account must contain a minimum amount of funds in order to make profitable the labor-intensive practice of locating heirs. Thus, the likely result of the majority's interpretation of the Act will be to encourage heir hunters to take their business out of New Jersey. The practical impact of that decision favors the fiscal interest of the State treasury—to the tune of an estimated $25,000,000 per year, see *ante* at 464, 591 *A*.2d at 914—over the public interest in locating the true owners of the unclaimed accounts. Notwithstanding that the current condition of the economy has taken a heavy toll on state budgets here and elsewhere, an interpretation of the Act that produces such a result bears careful scrutiny.

For many years, the Treasurer's practice had been to disclose information contained in escheat records only to apparent owners and to withhold that information from heir hunters, ostensibly to prevent heir hunters from deceiving and defrauding the public. The Legislature enacted the UUPA in 1989 for the purpose of establishing comprehensive regulation of access to unclaimed property, and in the process provided for regulation of those engaged in heir hunting. Specifically, heir hunters are prohibited from entering into agreements to locate abandoned bank accounts for the time period beginning one year before the holder delivers the property to the State (nine years after the property is abandoned) and ending twenty-four months after the property is delivered to the State (twelve years after

the property is abandoned). *N.J.S.A.* 46:30B–106. Further, heir hunters may not charge a fee greater than twenty percent of the value of the property recovered. *Ibid.* Presumably, the Legislature adopted those safeguards in order to regulate, not prohibit, the business of heir hunting.

As noted by the majority, the conflict in this case focuses on two sections of the UUPA, *N.J.S.A.* 46:30B–76 and –76.1. The former directs the Treasurer to "record the name and last known address" of the apparent owner of unclaimed bank deposits and to provide for the public inspection of that record. The latter provides that any information "deemed confidential under any New Jersey or federal law when in possession [of a bank]" remains confidential when delivered to the Treasurer. Because the bank-account balance was regarded as confidential under state and federal law, the majority construes those two sections to mean that although the name and address of the account owner may be disclosed, the amount due the depositor of an abandoned bank account is confidential and therefore not a public record. *Ante* at 471–473, 591 *A.*2d at 918–919.

Only two theories could be advanced to support the majority's interpretation of the statute. One would be that the Legislature intended that account balances be withheld from heir hunters in order to advance the State's financial interests and defeat the interests of the rightful owners. Obviously, we should be hesitant in imputing to the Legislature so self-serving a purpose. *Cf.* N. Singer, 2A *Sutherland Statutes and Statutory Construction* § 45.12, at 54 (Sands 4th ed. 1984) (noting that "departure from the literal construction of a statute is justified when such a construction would produce an * * * unjust result"). The other theory would be that the true owners of the accounts—most of whom are deceased or have long since forgotten that the accounts exist—and their heirs have an interest in protecting the confidentiality of the account balances from heir hunters in the business of locating those entitled to the money. The very statement of that proposition demonstrates the incongruity of recognizing an owner's confi-

dentiality interest in the balance of an account not known to exist by that owner, particularly when disclosure of the balance might advance the owner's chance to recover the funds. The Appellate Division observed that weakness in the State's argument, presuming "implied consent by the depositor to this disclosure, which would obviously be in the interest of the owner of an unclaimed deposit." 239 *N.J.Super.* at 360, 571 *A.*2d 333.

On that issue, the Appellate Division's construction of the statute is both pragmatic and fair. We should not construe the statute to mandate a confidentiality interest in the balances of unclaimed accounts the existence of which is unknown to the true owners or their heirs.

I would affirm the judgment of the Appellate Division.

Justice CLIFFORD joins in this opinion.

*For reversal and remandment*—Chief Justice WILENTZ, and Justices HANDLER, POLLOCK, O'HERN and GARIBALDI—5.

*For affirmance*—Justices CLIFFORD and STEIN—2.